**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINE BISCHOFF, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTSONS COMPANIES, INC., ACME MARKETS, INC., SAFEWAY, INC., BETTER LIVING BRANDS, LLC, and LNK INTERNATIONAL, INC.,<br><br>Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Christine Bischoff ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Albertsons Companies, Inc., ACME Markets, Inc., Safeway, Inc., Better Living Brands, LLC, and LNK International, Inc. (collectively, "Defendants" or "Albertsons").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendants for cheating customers by uniformly advertising, marketing, and selling generic versions of certain over-the-counter drugs, including analgesic or pain-relieving medicines using acetaminophen under the brand name "Signature Care" (the "Class Rapid Release Gelcaps" or the "Products"), prominently bearing the misrepresentation "Rapid Release" (the "Rapid Release Claims" or "Misrepresentation").  However, contrary to Defendants' claims, the purported "Rapid Release" Products actually dissolve *slower* than Signature Care-branded non-rapid release acetaminophen

products made and sold in tablet and caplet form.

     2.     Albertsons is the second largest supermarket chain in the United States.[1] As of February 2022, Albertsons "operated 2,276 retail stores … across 34 states and the District of Columbia with 24 banners including Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market."[2] At each of these stores and banners, Defendants sell a variety of health and wellness products, including over-the-counter pharmaceuticals. Relevant here, in addition to selling brand name over-the-counter drugs, Defendants also produce, manufacture, market, distribute, and sell the Class Rapid Release Gelcaps.



---

[1] *See, e.g.*, Statista Research Department, *Revenues of Albertsons Companies U.S. 2020, by segment* (Jan. 27, 2022), https://www.statista.com/statistics/1167551/albertsons-revenue-by-segment-us/ ("As the second-largest supermarket chain in the North America, Albertsons generated retail sales and other revenues exceeding 69 billion U.S. dollars in 2020."); Statista Research Department, *Net sales of Albertsons Companies U.S. 2015-2020* (Jan. 27, 2022), https://www.statista.com/statistics/1167526/albertsons-net-sales-us/; *see also* Statista Research Department, *Albertsons Companies Statistics & Facts* (Jan. 24, 2022), https://www.statista.com/topics/6931/albertsons-companies/#dossierKeyfigures ("Today, Albertsons Companies operates over 2,270 stores throughout the United States and employs around 300,000 people, making it one of the largest supermarket chains in North America.").

[2] *Albertsons Companies, Inc. Reports Fourth Quarter and Full Year Results* (Apr. 12, 2022), *available at* https://www.albertsonscompanies.com/newsroom/press-releases/news-details/2022/Albertsons-Companies-Inc.-Reports-Fourth-Quarter-and-Full-Year-Results/default.aspx. *See also* Albertsons Companies, *Q4 2021 Latest Quarterly Results: Earnings Release Infographic* (Apr. 2022), *available at* https://s29.q4cdn.com/239956855/files/doc_financials/2021/q4/ALBCIV184062_CORP_ACI_InvestorRelations_April2022-FINAL.pdf; Albertsons Companies, *Company Fact Sheet* (Apr. 2022), *available at* https://s29.q4cdn.com/239956855/files/doc_downloads/2022/04/ALBCIV181099_CORP_ACI_FactSheet_FY2021_April2022-_-FINAL.pdf; Albertsons Companies, "Investors," *available at* https://www.albertsonscompanies.com/investors/overview/default.aspx.



3.      In 2005, Johnson & Johnson Consumer Inc. introduced the name brand Tylenol®

Extra Strength Rapid Release Gels to the American public, purporting that its "Gelcaps [] are

specially designed with holes to allow [for] the release of powerful medicine *even faster than*

*before*."[3]  Three years later, in 2008, Tylenol® PM Rapid Release Gels were launched with the

same promises.[4]

4.      Relevant to these allegations, Tylenol® is the branded name for acetaminophen.

In other words, acetaminophen is "generic Tylenol®."

---

[3] https://www.tylenol.com/news/about-us (last accessed May 5, 2022) (emphasis added).

[4] *Id.*

5.      Defendants then introduced their own version of the Tylenol® Extra Strength

Rapid Release Gels called "Signature Care Rapid Release Gelcaps:"[5]





---

[5] *See, e.g.*, https://www.acmemarkets.com/shop/product-details.960326318.html;
https://www.albertsons.com/shop/product-details.960189576.177.html; https://www.safeway.com/shop/product-details.157050117.html.

6.      Defendants also introduced their own version of the Tylenol® Extra Strength PM Rapid Release Gels called "Signature Care PM Rapid Release Gelcaps" (together with Signature Care Rapid Release Gelcaps, the "Class Rapid Release Gelcaps"):[6]



7.      Since the release of the Class Rapid Release Gelcaps, Defendants have misled, and continue to mislead, consumers about the nature, quality, and effectiveness of the Products through their advertising and labeling.  Specifically, Defendants market the Class Rapid Release Gelcaps as "comparable to Tylenol® Extra Strength Rapid Release Gels," even though they actually dissolve *slower* than Defendants' acetaminophen in traditional tablet and caplet form.

8.      More importantly, following Tylenol's lead, Defendants prominently label every Product sold in the United States as "Rapid Release" Gelcaps.

9.      But Defendants' Rapid Release Claims concerning the Products are false, misleading, and deceptive to consumers, who reasonably understand such claims to mean that the Products work faster for consumers than non-rapid release products with the same active ingredients and of the same dosage.  However, despite what Defendants' marketing and labeling

---

[6] *See, e.g.*, https://www.acmemarkets.com/shop/product-details.960019790.html; https://www.albertsons.com/shop/product-details.960019790.html; https://www.safeway.com/shop/product-details.960171151.html.

would have consumers believe, the Class Rapid Release Gelcaps do <u>not</u> provide faster pain relief than their non-rapid release counterparts.

10.     In fact, independent testing conducted by Valisure, LLC ("Valisure")[7] demonstrates that the Class Rapid Release Gelcaps dissolve *slower* than the Signature Care-branded non-rapid release acetaminophen products made and sold in caplet form.  A true and correct copy of these test results is attached hereto as **Exhibit A**.

11.     These test results are consistent with the findings of a 2018 study – also conducted by Valisure – which demonstrates that generic acetaminophen rapid release gelcaps sold by Walgreens, Walmart, and Rite Aid dissolve slower than these companies' non-rapid release versions of acetaminophen sold in tablet or caplet form.[8]  "Results [of the study] indicate that acetaminophen gelcaps marketed as rapid or fast-release are slower acting under *in vitro* dissolution conditions compared to the company-matched tablet dose."[9]  A true and correct copy

---

[7] Valisure is an "independent laboratory and partner for quality that is committed to increasing transparency and quality assurance throughout the healthcare industry."  https://www.valisure.com/#Independent-Analysis.  In service of that mission, Valisure "offers independent certification, analytical studies and advocacy, vendor validation, consulting and other specialty projects that focus on science-based product quality."  *Id.*; *see also* "About Us," https://www.valisure.com/about ("In response to rising concerns and quality issues in the global supply chain, Valisure's team of Harvard- and Yale-trained scientists developed proprietary analytical technologies to independently test products, identify critical issues, and offer services to help distinguish quality stakeholders and products.").

[8] *See* Jessop Kucera, et al., *Rapid and Fast-Release Acetaminophen Gelcaps Dissolve Slower Than Acetaminophen Tablets*, ADV. INV. PHA. THE. MEDIC., 1:63-71 (Nov. 12, 2018) [hereinafter "2018 Valisure Acetaminophen Study"], *available at* http://www.kenkyugroup.org/article/8/173/Rapid-and-Fast-Release-Acetaminophen-Gelcaps-Dissolve-Slower-Than-Acetaminophen-Tablets; *see also* Washington Post, *'Rapid release' Tylenol gelcaps are slower to dissolve than cheaper tablets, study finds* (Nov. 14, 2018), https://www.washingtonpost.com/health/2018/11/14/rapid-release-tylenol-gelcaps-are-slower-dissolve-than-cheaper-tablets-study-finds/.

[9] 2018 Valisure Acetaminophen Study; *see also id.* ("To better understand the influence of gelatin coatings on gelcap dissolution, four gelcaps from each of the twenty-five lots tested during the primary study (n = 100) were examined with their red and blue encapsulation removed. … Results suggest that the <u>removal of a gelcap's red and blue coating speeds up, on average, the time required for fully dissolving by 26%. This faster dissolution time suggests that gelcaps are a barrier for dissolution</u>.") (emphasis added) (internal citations omitted); *id.* ("The results of the study suggest that acetaminophen gelcaps packaged with marketed claims of rapid or fast-release tend to dissolve slower than tablets of identical dosage sold by the same company."); *id.* ("Our results suggest that the gelatin coating added to rapid or fast-release gelcaps delays in vitro release of medication.").

of the 2018 Valisure Acetaminophen Study is attached hereto as **Exhibit B**.

12.     Defendants have long known or should have known that traditional, non-rapid release acetaminophen products can be equally effective in the same, if not faster, in the same time period than the Class Rapid Release Gelcaps.

13.     Nevertheless, Defendants sell the Class Rapid Release Gelcaps as an alternative to their traditional Signature Care-branded acetaminophen caplets, which are sold at a lower price and do not contain the "rapid release" language on the label.  In other words, Defendants charge a premium for the Class Rapid Release Gelcaps.[10]

14.     By prominently featuring the Rapid Release Claims on the labeling and/or packaging of the Class Rapid Release Gelcaps, Defendants intended to induce consumers to pay more than they would pay for other comparable products that are not falsely labeled with Rapid Release Claims, and consumers are so induced as a result of these claims.

15.     Defendants knew or should have known about the mislabeling.  According to Shane Sampson, Defendants' Chief Marketing and Merchandising Officer, "[a]t Albertsons Companies, we won't put our Signature label on just anything; a product has to meet rigorous quality standards and be an exceptional value to carry the Signature brand."[11]

16.     Plaintiff and members of the putative Class and Subclass would not have purchased the Class Rapid Release Gelcaps had Defendants disclosed accurate information about the products and not misled them into believing that the Class Rapid Release Gelcaps would

---

[10] *See infra*.  *See also* 2018 Valisure Acetaminophen Study, *supra note* 8 ("These rapid or fast-release labeled medications are sold at an average of a 23% higher price[.]"); Washington Post, *'Rapid release' Tylenol gelcaps are slower to dissolve than cheaper tablets, study finds* (Nov. 14, 2018) ("Overall, the rapid-release gels carried a 23 percent higher price than the tablets[.]").

[11] Business Wire, *Signature Offers a Wide Range of Quality Products Helping Customers Create Their Own Signature Moments with Pride* (Apr. 4, 2016), *available at* https://www.businesswire.com/news/home/20160404005193/en/Albertsons-Companies-Introduces-the-New-Signature-Family-of-Brands (internal quotation marks omitted).

provide faster relief than other, cheaper acetaminophen products, such as the traditional

Signature Care non-rapid release acetaminophen sold in caplet and tablet form.

17.     Plaintiff brings this suit to now end Defendants' deceptive practices as described

above and to recover the ill-gotten gains obtained by Defendants through this deception.

18.     For the foregoing reasons, Plaintiff brings this action individually and on behalf

of similarly situated individuals against Defendants for: (i) violation of New York's General

Business Law § 349; (ii) violation of New York's General Business Law § 350; (iii) breach of

express warranty; (iv) breach of the implied warranty of merchantability; (v) unjust enrichment /

restitution; (vi) negligent misrepresentation; and (vii) fraud.

## THE PARTIES

19.     Plaintiff Christine Bischoff is a natural person and a citizen of New York who

resides in Peekskill, New York.  Plaintiff Bischoff purchased Defendants' Signature Care Rapid

Release Acetaminophen Gelcaps on several occasions during the Class Period, her most recent

purchase occurring in or around June 2021, from an ACME Markets brick-and-mortar retail store

located in Mohegan Lake, New York.  Prior to her purchase, Plaintiff Bischoff reviewed the

labeling, packaging, and marketing materials for the Product and saw the Misrepresentations that

the Product contains acetaminophen in the form of purportedly "Rapid Release" gelcaps.

Plaintiff Bischoff relied on that labeling and packaging to choose the Product over their less

expensive, non-rapid release counterparts of the same dosage.  Plaintiff Bischoff saw these Rapid

Release Claims prior to and at the time of purchase, and she understood them as representations

and warranties by Defendants that the Products release acetaminophen into the body faster and

thus provide quicker pain relief than non-rapid release products with the same active ingredients

and of the same dosage.  Based on that understanding, Plaintiff Bischoff purchased the Products

because she specifically sought acetaminophen for help with her migraines and, specifically, the "Rapid Release" Gelcaps form because she wanted the fastest pain relief available. Plaintiff Bischoff therefore reasonably relied on Defendants' Rapid Release Claims when she purchased the Product. Accordingly, these representations and warranties were part of the basis of the bargain, in that Plaintiff Bischoff would not have purchased the Products on the same terms had she known these representations were not true. In making her purchase, Plaintiff Bischoff paid a substantial price premium due to the false and misleading Rapid Release Claims. However, Plaintiff Bischoff did not receive the benefit of her bargain, because Defendants' purportedly "Rapid Release" Products do not, in fact, work faster than their less expensive, non-rapid release counterparts in caplet or table form containing acetaminophen in the same dosage.

20.     Defendant Albertsons Companies, Inc. ("ACI") is a Delaware corporation with its principal place of business and headquarters at 250 Parkcenter Blvd, Boise, Idaho 83706. As "one of the largest food and drug retailers in the United States,"[12] ACI owns and operates more than 2,200 retail stores across the country under 24 different banners, including Albertsons and Safeway.[13] In addition, in 2016, ACI launched "its new store brand, Signature, the largest

---

[12] *See* Albertsons Companies, "Investors," *available at*
https://www.albertsonscompanies.com/investors/overview/default.aspx. *See also* Albertsons Companies, Inc., Form S-1/A (Jun. 10, 2020), https://sec.report/Document/0001193125-20-165122/ ("We hold a #1 or #2 position by market share in 68% of the 121 metropolitan statistical areas ("MSAs") in which we operate. … We believe this local market presence, coupled with brand recognition, drives repeat traffic and helps create marketing, distribution and omni-channel efficiencies that enhance our profitability.").

[13] On information and belief, Defendant ACI controls the marketing and pricing practices of the more than 2,200 ACI-owned retail stores located throughout the United States, and all banners under which those stores operate. *See, e.g.*, Albertsons Companies, Inc., 2021 Annual Report (Form 10-K), at 8-9, *available at*
https://annualreport.stocklight.com/NYSE/ACI/21864714.pdf ("Our retail operating divisions are geographically based, have similar economic characteristics and similar expected long-term financial performance. … Across all operating segments, the Company operates primarily one store format. Each division offers, through its stores and digital channels, the same general mix of products with similar pricing to similar categories of customers, have similar distribution methods, operate in similar regulatory environments and purchase merchandise from similar or the same vendors. … Our marketing efforts involve collaboration between our national marketing and merchandising team and local divisions and stores. We augment the local division teams with corporate resources and are focused on providing expertise, sharing best practices and leveraging scale in partnership with leading consumer packaged goods vendors. … We have recently deployed and are continuing to refine cloud-based

private label across [its more than 2,200] stores."[14]  The Signature line "is exclusive to

Albertsons Companies and is carried by all [of its] banners."[15]  Relevant here, ACI owns and

operates the "Signature Care" brand, the health products segment of ACI's Signature label, and it

manufactures, labels, sells, and distributes all Signature Care-branded products to consumers in

New York and throughout the United States, including the Class Rapid Release Gelcaps, which

are generic versions of pain-relieving medicines sold under the Signature Care brand name.  ACI

is also responsible for in-store signage, promotion, advertisement, and marketing of the Class

Rapid Release Gelcaps, and it owns and operates the websites for Acme, Albertsons, Safeway,

and all other ACI banner stores.  At all relevant times, acting alone or in concert with others,

ACI has done business in New York and throughout the United States.  At all relevant times,

acting alone or in concert with others, ACI advertised, marketed, sold, and distributed the Class

Rapid Release Gelcaps to consumers in New York and throughout the United States.  Further,

acting alone or in concert with others, ACI has, at all relevant times, formulated, directed,

---

enterprise solutions to quickly process proprietary customer, product and transaction data and efficiently provide our local managers with targeted marketing strategies for customers in their communities.  By leveraging customer and transaction information with data driven analytics, our 'personalized deal engine' is able to select, out of the thousands of different promotions offered by our suppliers, the offers that we expect will be most compelling to each of our more than 30 million weekly customers.  In addition, we use data analytics to optimize shelf assortment and space in our stores[.]"); *see also* Albertsons Companies, Inc., Form S-1/A (Jun. 10, 2020), https://sec.report/Document/0001193125-20-165122/ ("We have integrated systems and converted stores and distribution centers to create a common platform. We believe our common platform gives us greater transparency and compatibility across our network, allowing us to better serve our customers and employees while enhancing our supply chain. We continue to sharpen our in-store execution, increase our Own Brands penetration and expand our omni-channel and digital capabilities.").

[14] Business Wire, *Signature Offers a Wide Range of Quality Products Helping Customers Create Their Own Signature Moments with Pride* (Apr. 4, 2016), *available at* https://www.businesswire.com/news/home/20160404005193/en/Albertsons-Companies-Introduces-the-New-Signature-Family-of-Brands ("Signature is a multi-category brand developed to address consumers' growing appetite for quality private label products from stores they trust. … Albertsons Companies has created quality items for the Signature brand across six product sectors – **Signature SELECT™**, **Signature Kitchens™**, **Signature Farms™**, **Signature Cafe®**, **Signature Home™**, and **Signature Care**™.  The line includes a wide assortment of pantry staples, prepared foods, fresh produce and ingredients that bring delight to any dish, as well as a broad range of paper goods, laundry products, personal care, and other items.") (bolding in original; underlining added for emphasis).

[15] *Id*.

controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

21.     Defendant ACME Markets, Inc. ("Acme"), is a Delaware corporation with its principal place of business and headquarters located in Boise, Idaho.  Acme is a subsidiary of, and operates as a banner of, ACI, which is "one of the largest food and drug retailers in the United States."[16]  Acme is a supermarket chain that sells grocery items, food, and general merchandise to consumers regionally, including the Class Rapid Release Gelcaps.  Acme operates 161 brick-and-mortar retail locations primarily located in and throughout the Northeastern United States, including 16 such locations in New York (including the Mohegan Lake, NY location where Plaintiff purchased her Product).  Acme sells Signature Care-branded products to consumers in New York and throughout the United States, including the Class Rapid Release Gelcaps.  Acme is also responsible for the in-store signage, promotion, advertisement, and marketing of the Class Rapid Release Gelcaps.  Additionally, at all relevant times, acting alone or in concert with others, Acme advertised, marketed, sold, and distributed the Class Rapid Release Gelcaps to consumers in New York and throughout the United States.  Acting alone or in concert with others, Acme formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth herein.

22.     Defendant Safeway, Inc. ("Safeway") is a Delaware corporation with its principal place of business and headquarters located in Pleasanton, California.  Safeway is a wholly owned subsidiary of, and "operates as a banner of[, ACI], one of the largest food and drug retailers in the United States."[17]  Safeway sells grocery items, food, and general merchandise to consumers

---

[16] https://www.acmemarkets.com/about-us.html.

[17] https://www.safeway.com/about-us.html.

regionally, and it provides a variety of specialty departments, such as bakery, delicatessen, floral and pharmacy.  Together with Defendant ACI, Safeway owns and operates the "Signature Care" trademark.  Acting alone or in concert with others, Safeway formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth herein.

23.     Defendant Better Living Brands, LLC ("BLB") is a limited liability company organized under Delaware law with its principal place of business and headquarters located in Pleasanton, California.  BLB is a wholly owned subsidiary of Defendant Safeway.  At all relevant times, BLB, acting alone or in concert with others, has manufactured, marketed, and distributed Signature Care-branded products, including the Class Rapid Release Gelcaps, to consumers in New York and throughout the United States.  Indeed, BLB is listed as the labeler of some or all of the Class Rapid Release Gelcaps directly on the Products' labeling.

24.     Defendant LNK International, Inc. ("LNK") is a New York for-profit corporation with its principal place of business and headquarters located at 22 Arkay Drive, Hauppauge, New York  11788.  LNK is "one of the nation's largest manufacturers of solid and liquid dose, over-the-counter (OTC) pharmaceuticals."[18]  LNK's operation includes providing, among other things, laboratory services, manufacturing services, packaging services, and marketing services for store brands like Signature Care.[19]  Relevant here, LNK, acting alone or in concert with others, manufactures, designs, labels, markets, and/or supplies the Class Rapid Release Gelcaps to consumers in New York and throughout the United States.

25.     Together, Defendants ACI, Acme, Safeway, BLB, and LNK (collectively, "Defendants") manufacture and distribute all Signature Care-branded products, including the

---

[18] https://www.lnkintl.com/.

[19] *See* https://www.lnkintl.com/our-operation; https://www.lnkintl.com/about-lnk.

Class Rapid Release Gelcaps, which are generic versions of pain-relieving medication sold under the Signature Care brand name exclusively at ACI banner stores.  Defendants are also responsible for the promotion, advertisement, marketing, and distribution of the Products in New York and throughout the United States.  Further, Defendants sell, and at all relevant times have sold, the Class Rapid Release Gelcaps to consumers in New York and throughout the United States.  Defendants have thus transacted in New York and throughout the United States at all times during the Class Period.

26.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired with them in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and there is at least minimal diversity in that Plaintiff, as well as most members of the proposed class, is a citizen of a state different from most Defendants.

28.     This Court has personal jurisdiction over Defendants have, at all times relevant hereto, sufficient minimum contacts with this state and District in that they have systematically and continually conducted business in New York, including within this District, and/or have intentionally availed themselves of the benefits and privileges of the New York consumer market through the promotion, marketing, and sale of their products and/or services to residents within

this District and throughout New York.  Additionally, Defendant LNK is incorporated under the laws of, and maintains its principal place of business and headquarters in, New York, rendering it essentially at home in this state.  Plaintiff Bischoff is also citizen of New York, purchased the Class Rapid Release Gelcaps from Defendants while in New York, and submits to the jurisdiction of the Court.

29.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the Plaintiff's claims occurred in this District.  Also, Plaintiff resides in this District and purchased the Class Rapid Release Gelcaps from Defendants from a brick-and-mortar Acme retail location in this District.  Moreover, Defendants systematically conduct business in this District and throughout the State of New York, and they distributed, advertised, and sold the Class Rapid Release Gelcaps to Plaintiff and other members of the proposed Nationwide Class and New York Subclass in this State and District.

## **FACTUAL ALLEGATIONS**

### A.     **Acetaminophen, Generally**

30.     Acetaminophen, also called paracetamol or N-acetyl-para-aminophenol (APAP), is an over-the-counter pain reliever and fever reducer that comes in a variety of forms: liquid suspension, capsules, tablets (including "caplets," *i.e.*, capsule-shaped tablets), and gelcaps.[20]

31.     In any form, acetaminophen is used to treat a variety of common conditions including headaches, muscle aches, arthritis, backaches, toothaches, colds, fevers, acute pain, chronic pain, etc.[21]  Typically, it is the first treatment recommended for any mild to moderate

---

[20] *See* 2018 Valisure Acetaminophen Study, *supra*.

[21] *See, e.g.*, https://www.drugs.com/acetaminophen.html; https://www.mayoclinic.org/chronic-pain-medication-decisions/art-20360371.

pain.  Therefore, acetaminophen is one of the most commonly used drugs in the world when it comes to pain mitigation, representing an estimated global market value of over $350 million annually.[22]  It is even included on the World Health Organization List of Essential Medicines.[23]

32.     Given the wide-spread use of acetaminophen, both the *quality* and *value* of acetaminophen products present important public health, consumer safety, and economic concerns.[24]

**B.     Defendants Seek To Capitalize Off Of Johnson & Johnson's Successful "Tylenol"-Brand Acetaminophen Products By Creating Generics**

33.     Tylenol® is the well-recognized brand name of acetaminophen that is produced, manufactured, and distributed by Johnson & Johnson.

34.     Johnson & Johnson currently lists 34 Tylenol® products on its Tylenol® website, including: 1 non-medicative device, 13 liquid products, 1 chewable product, 1 tablet product, 1 coated tablet product, 13 caplet products, and 2 gelcap products.[25]  All but two of the 34 products contain acetaminophen.[26]  Johnson & Johnson has profited and continues to profit greatly from this Tylenol® product line.

35.     Generic brands, like Signature Care, thus seek to mimic the product offerings of Johnson & Johnson, selling generic versions of the Tylenol® products.  Indeed, Defendants have done this with respect to several Tylenol® products, mimicking the Tylenol® Extra Strength Rapid Release gels.

---

[22] *See* 2018 Valisure Acetaminophen Study, *supra.*

[23] World Health Organization ("WHO"), *Model List of Essential Medicines* (Aug. 2017 ed.), http://www.who.int/medicines/publications/essentialmedicines/en/2017.

[24] *See* 2018 Valisure Acetaminophen Study, *supra*.

[25] https://www.tylenol.com/products (last accessed May 5, 2022).

[26] *Id*.  SmartCheck™ Digital Ear Scope From Children's Tylenol® (an at-home digital ear scope containing no medication) and Tylenol® PM Simply Sleep Nighttime Sleep Aid do not contain acetaminophen.

C.      **The Marketing Of Rapid Release Acetaminophen**

36.      Johnson & Johnson introduced Tylenol® Extra Strength Rapid Release Gels in 2005, claiming that these rapid release gelcaps are "specially designed…to allow the release of powerful medicine *even faster than before*."[27]  In 2008, Tylenol® PM Rapid Release Gels launched utilizing the same "rapid release" technology and the same or similar advertising.[28] Thus, this claim – that these rapid release gelcaps worked even faster than before – became associated with the regular and PM versions of Tylenol® Extra Strength Rapid Release Gels.

37.      Then, in 2009, Tylenol's rapid release gels were recalled and were not re-released until 2017.[29]  "The national return to the market of the rapid release gels represented Tylenol's biggest product launch in years" and, thus, the marketing campaign "involved triple the investment" that Johnson & Johnson would normally spend all to encourage consumers to find "fast working pain relief."[30]  "In the first month, [the campaign] reached over 25 million shoppers on their mobile devices across five key markets, resulting in both category and Tylenol share growth at Walgreens."[31]  Consumers were inundated with the campaign messaging in stores and online.[32]

38.      In its marketing, Johnson & Johnson used buzz words that emphasized the speed,

---

[27] https://www.tylenol.com/news/about-us (last accessed May 5, 2022) (emphasis added).

[28] *Id*.

[29] Consumer Goods Technology, *Headache Sufferers Directed to Walgreens* (Jun. 1, 2017), https://consumergoods.com/headache-sufferers-directed-walgreens (last accessed Jan. 27, 2021).

[30] *Id*.

[31] *Id*.

[32] *Id*. ("In stores, shoppers found Tylenol messaging at every turn, from displays in-aisle to endcaps to the pharmacy counter to checkout.  In 3,200 Walgreens stores, motion-activated video units installed for the campaign featured a 15-second video spot customized for the retailer.  The video unit and off-shelf placement remained for six months. * The spot also ran for 12 weeks on YouTube, demonstrating how the laser-drilled gelcaps release medicine quickly for fast relief. The launch also was supported via Walgreens.com, email blasts, the retailer's Facebook page, a Google campaign, FSIs and paid search.").

fast-acting nature, and unique laser-drilled holes of the rapid release gelcaps.  For example,
Johnson & Johnson advertised that "only Tylenol rapid release gels have laser-drilled holes" and
claimed that they "release medicine fast for fast pain relief" and that the product supposedly
"works at the speed of life."

39.     This marketing campaign has been successful in getting the public to believe that
the rapid release gelcaps are faster acting than traditional formulations, when in fact they may be
slower in certain circumstances – such as the formulation sold by Defendants.  Consumer
reviews and comments indicate that consumers have been deceived and confused by these
representations; and some even notice after purchase that certain "rapid release" gelcaps do not
work faster than regular, non-rapid release formulations.

**D.      Defendants' False, Misleading, Unfair, And Deceptive Marketing,
         Labeling, And Sale Of The Signature Care Rapid Release Gelcaps**

40.     Numerous companies, including Defendants, have followed Johnson & Johnson's
lead with respect to the labeling, marketing, advertising, and pricing of their acetaminophen
products, including the Products at issue in this case.  Now, in general, acetaminophen gelcap
products labeled, advertised, or marketed as "rapid release," "fast-release," or the like, are sold
on average at a price 23% higher than those traditional acetaminophen products sold in caplet or
tablet form that do not make any Rapid Release Claims.

41.     As noted above, Defendants are, collectively, one such entity that followed
Johnson & Johnson's lead.  Defendants sell their Class Rapid Release Gelcaps at a higher price
than their other, faster acting acetaminophen products not featuring the Rapid Release Claims.

42.     Defendants currently list 5 Class Rapid Release Gelcap products on their
websites, including: Signature Care Extra Strength Acetaminophen Rapid Release Gelcaps in
quantities of 24, 100, and 225 gelcaps; and Signature Care Extra Strength PM Acetaminophen

Gelcaps in quantities of 20 and 80 gelcaps.[33]  Additionally, Defendants' websites currently show that they sell 9 traditional acetaminophen products at the same dosage (500 mg) that do not feature the Rapid Release Claims, including: Signature Care Extra Strength Acetaminophen Caplets in quantities of 24, 50, 100, 150, 250, and 500 caplets; and Signature Care Extra Strength PM Acetaminophen Caplets in quantities of 24, 100, and 200 caplets.[34]

43.     A comparison of the market prices of the Class Rapid Release Gelcaps and the traditional Signature Care-branded acetaminophen caplets of the same dosage and quantities demonstrates that Defendants charge more for the Class Rapid Release Gelcaps than their equivalent non-rapid release acetaminophen products.  For instance, currently at Acme, a regularly priced 100-count bottle of Signature Care Extra Strength Acetaminophen Rapid Release Gelcaps costs $13.99[35] (about $0.14 per unit) while a regularly priced 100-count bottle of Signature Care Extra Strength Acetaminophen caplets costs $10.99[36] (roughly $0.11 per unit). Thus, with respect to the 100-count bottles, there is a $3.00 price difference between the Class Rapid Release Gelcaps and the non-rapid release Signature Care products sold at Acme, a difference of approximately $0.03 per unit.

44.     Thus, the Class Rapid Release Gelcaps are more expensive than the non-rapid

---

[33] *See, e.g.*, https://www.acmemarkets.com/shop/search-results.html?q=signature%20care%20gelcap; https://www.albertsons.com/shop/search-results.html?q=signature%20care%20gelcaps; https://www.safeway.com/shop/search-results.html?q=signature%20care%20rapid%20release%20gelcap; *see also* https://www.shaws.com/shop/search-results.html?q=signature%20care%20gelcap.

[34] *See, e.g.*, https://www.acmemarkets.com/shop/search-results.html?q=signature%20care%20pain%20relief%20acetaminophen%20extra%20strength%20caplets; https://www.albertsons.com/shop/search-results.html?q=signature%20care%20pain%20relief%20acetaminophen%20extra%20strength%20caplets; https://www.safeway.com/shop/search-results.html?q=signature%20care%20pain%20relief%20acetaminophen%20extra%20strength%20caplets; https://www.shaws.com/shop/search-results.html?q=signature%20care%20pain%20relief%20acetaminophen%20extra%20strength%20caplets.

[35] *See* https://www.acmemarkets.com/shop/product-details.157050117.html (last accessed May 26, 2022).

[36] *See* https://www.acmemarkets.com/shop/product-details.157050006.html (last accessed May 26, 2022).

release Signature Care products, even though independent testing commissioned by Plaintiff's counsel reveals that the Class Rapid Release Gelcaps are, in reality, *slower* acting compared to the Signature Care-brand caplet and tablet doses. *See* Ex. A.

45.     Yet, consumers are willing to pay this price premium because, as a result of Defendants' false, misleading, unfair, and/or deceptive labeling concerning Rapid Release Claims (and other related advertising), they believe the Class Rapid Release Gelcaps work faster than other, cheaper acetaminophen products when in fact, they do not.

46.     As a generic brand of acetaminophen, Defendants introduced the Class Rapid Release Gelcaps under the Signature Care brand name as counterparts to the Tylenol® products, but only after the public had already become familiar with the Tylenol® versions. Thus, with respect to the Class Rapid Release Gelcaps, Defendants relied on Johnson & Johnson's massive marketing campaigns and the success of its rapid release products before entering the market, thereby reaping the benefits of Johnson & Johnson's marketing efforts while avoiding the substantial investment capital associated with such efforts.

47.     One way in which Defendants did this was by producing the Class Rapid Release Gelcaps to look the same as or substantially similar to their counterpart Tylenol® rapid release products. Indeed, Defendants' extra strength, non-PM "Rapid Release" acetaminophen gelcaps are approximately the same size and shape as the Tylenol® products, and utilize the same distinct color pattern: red on one end, blue on the other end, and a bit of white in the middle. Thus, by the time Defendants entered the market with the Class Rapid Release Gelcaps, consumers were already accustomed to the look of the Tylenol® rapid release products and familiar with the claims that they were fast-acting.

48.     Defendants did nothing to correct the perception that their "rapid release" gelcaps

worked faster than other, cheaper acetaminophen products.  Instead, Defendants capitalized on that thinking and sought to further consumer deceit by adding their own prominent false, misleading, unfair, and/or deceptive Rapid Release Claims to the labeling and packaging of the Class Rapid Release Gelcaps.  Defendants also explicitly liken the Class Rapid Release Gelcaps to their Products' Tylenol® counterparts on the Products' labeling and packaging and in other marketing materials for the Products.

49.     Consumers purchase the Signature Care Class Rapid Release Gelcaps because they are labeled "rapid release," which they reasonably understand to mean that the Products are faster-acting than Defendants' non-rapid release Signature Care-branded acetaminophen product in caplet and tablet forms, and because they are cheaper than their Tylenol® rapid release counterparts.

**E.     Independent Lab Testing Demonstrates The Labeling And Marketing Of The Class Rapid Release Gelcaps Are False, Misleading, Unfair, And/Or Deceptive**

50.     Notwithstanding Defendants' claims to the contrary regarding the Class Rapid Release Gelcaps, they do not work faster than other, cheaper non-rapid release Signature Care acetaminophen products sold in tablet and/or caplet form.  Rather, as shown in the images below, independent testing commissioned by Plaintiff's counsel revealed that the Products not only fail to work faster, they actually work slower than their traditional acetaminophen caplet counterparts:



**Figure:** Dissolution shown as a proportion of label claim acetaminophen (500 mg) released into solution over time shown in minutes (min). Red is caplet (lot 1ME1938) data and blue is gelcap (lot P126037) data.

**Table:** Time (minutes) for 75-95% dissolution by product.

| Brand: | | **Signature Care** | |
|---|---|---|---|
| Lot: | | P126037 | 1ME1938 |
| Description: | | gelcap | caplet |
| Percent dissolved | 75% | 10.0 | 8.9 |
| | 80% | 10.9 | 9.7 |
| | 85% | 12.0 | 10.7 |
| | 90% | 13.3 | 12.0 |
| | 95% | 15.5 | 14.0 |

Ex. A.

51.     These results are consistent with the 2018 Valisure Acetaminophen Study, in which Valisure investigated "rapid release" or "fast release" medications from five major U.S. companies selling acetaminophen (Rite Aid, Walgreens, CVS, Johnson & Johnson Tylenol, and

Walmart Equate), compared to company-matched tablets that do not have claims of rapid or fast-release characteristics.  Valisure did this through dissolution testing, which is commonly used in the pharmaceutical industry to test the quality and effectiveness of drug release from solid oral medications.  Ultimately, Valisure's 2018 testing revealed that, like the Class Rapid Release Gelcaps at issue in this case, the "rapid release" gelcap products not only failed to work faster than the company-matched tablet dose, but in fact the gelcaps actually worked *slower* than their non-rapid release counterparts.[37]

52.     Thus, the science demonstrates that Defendants' Rapid Release Claims are false, misleading, unfair, and/or deceptive on their face.

53.     Defendants knew or should have known of the existence of their "contradictory claims for rapid or fast-release [acetaminophen] products."[38]

54.     The level of deception and unfairness is elevated given that Defendants have long known or should have known that there is scant or conflicting evidence about the correlation of the speed and efficacy of its acetaminophen products to its rapid release gelcap design.

55.     There is no proven significant efficacy difference between the Signature Care rapid release products and the Signature Care non-rapid release products to warrant Defendants' representations that the Class Rapid Release Gelcaps work faster than their non-rapid release counterparts.  To the contrary, these laboratory results reveal that the Class Rapid Release Gelcaps dissolve significantly slower than Defendants' traditional, non-rapid release formulation.

56.     Defendants knew or should have known that their Rapid Release Claims were

---

[37] *See* 2018 Valisure Acetaminophen Study, *supra*.

[38] *Id*.

false, misleading, unfair, and/or deceptive.  Yet, Defendants falsely marketed the Products with the Rapid Release Claims, deliberately and falsely suggesting to consumers that the Class Rapid Release Gelcaps worked faster than their other, cheaper, non-rapid release acetaminophen products.

57.     Defendants' conduct induced, and continues to induce, unwitting consumers to buy the Class Rapid Release Gelcaps at a price that exceeds the actual value of the Product, and comes at a significant price premium when compared to traditional, non-rapid release formulations.

## CLASS ACTION ALLEGATIONS

58.     *Class Definition*: Plaintiff brings this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class and subclass of similarly situated individuals, defined as follows:

(a)     *Nationwide Class.*  Plaintiff seeks to represent a nationwide class of similarly situated individuals, defined as all persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue (the "Nationwide Class" or "Class").

(b)     *New York Subclass.*  Plaintiff also seeks to represent a subclass of all Class members who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue in New York (the "New York Subclass" or "Subclass").

59.     Specifically excluded from the Class and Subclass are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

60.     Plaintiff reserves the right to amend the definitions of this Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

61.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the members of the Class number in the millions, and the Subclass comprises at least thousands of consumers throughout New York. The precise number of Class and Subclass members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class and Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

62.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class and Subclass members and predominate over questions affecting only individual Class and Subclass members.  Common legal and factual questions include, but are not limited to: (a) whether Defendants warranted the Products as "Rapid Release;" (b) whether Defendants breached these warranties; (c) whether Defendants committed the statutory and common law violations alleged against them herein by doing so; (d) whether Plaintiff and members of the Class and Subclass are entitled to damages and/or restitution; (e) whether Defendants should be enjoined from further engaging in the misconduct alleged herein; and (f) whether Plaintiff and members of the Class and Subclass are entitled to attorneys' fees and costs.

63.     ***Typicality.***  The claims of Plaintiff Bischoff are typical of the claims of the Class and Subclass in that Plaintiff and members of the proposed Class and Subclasses purchased Defendants' Products in reliance on the representations and warranties described above and suffered a loss as a result of Defendants' uniform wrongful conduct.

64.     ***Adequacy***.  Plaintiff is an adequate representative of the Class and Subclass

because Plaintiff has no interests antagonistic to Class and Subclass members' interests, Plaintiff

has retained competent counsel with considerable experience and success in prosecuting

complex class actions and consumer protection cases, and Plaintiff and the undersigned counsel

intend to prosecute this action vigorously.  The interests of the Class and Subclass members will

be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

65.     ***Superiority***.  A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy.  Each individual Class and Subclass member may

lack the resources to undergo the burden and expense of individual prosecution of the complex

and extensive litigation necessary to establish Defendants' liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendants' liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of liability issues.  Thus, the Class and

Subclass are readily definable and prosecution as a class action avoids repetitious litigation and

duplicative litigation costs, conserves judicial resources, ensures uniformity of decisions, and

permits claims to be handled in an orderly and expeditious manner.

66.     Defendants have acted or failed to act on grounds generally applicable to the

Class and Subclasses, thereby making appropriate final injunctive relief with respect to the Class

and Subclass as a whole.

67.     Without a class action, Defendants will continue a course of action that will result

in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of their wrongdoing.

68.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violation Of New York's General Business Law ("GBL") § 349**
**(On Behalf Of The New York Subclass)**

69.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

70.     Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

71.     New York's General Business Law § 349 ("GBL § 349") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

72.     GBL § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring … an action to recover his actual damages or fifty dollars, whichever is greater."  GBL § 349(h) further provides that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."

73.     Defendants design, manufacture, distribution, marketing, advertising, labeling, and sale of the Class Rapid Release Gelcaps throughout the New York constitutes "business, trade or commerce" under GBL § 349(a).

74.     Plaintiff and members of the New York Subclass are consumers who purchased products from Defendants for their personal use.  Defendants' conduct violates GBL § 349

because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the New York Subclass Members, conveying, on the labeling and packaging for the Products and elsewhere, the Misrepresentations that the Products are "Rapid Release" Gelcaps, inducing reasonable consumers to believe that the Class Rapid Release Gelcaps would provide faster pain relief than their non-rapid release caplet counterparts, when in fact the Class Rapid Release Gelcaps are slower than the Signature Care-branded non-rapid release caplets at the same dosage.

75.     Defendants' marketing and sale of the Products misrepresented material facts concerning the qualities, characteristics, and benefits associated with the use of the Products. Defendants also made misleading statements concerning the fitness of the Products for providing fast pain relief.  These representations were deceptive, false, and misleading given that independent testing commissioned by Plaintiff's counsel reveals that the Class Rapid Release Gelcaps are, in reality, *slower* acting compared to the Signature Care-brand caplets of the same dosage.  Defendants' conduct as described herein is inherently deceptive and materially misleading, and the falsity of the Rapid Release Claims were known, or by the exercise of reasonable care should have been known, to be untrue, deceptive, and/or misleading by Defendants.

76.     Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the New York Subclass.

77.     Defendants' actions impact the public interest because Plaintiff and the New York Subclass have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

78.     Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the New York Subclass.

79.     Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the New York Subclass.

80.     Defendants' violation of GBL § 349 was willful and knowing.  As described above, at all relevant times, Defendants knew or should have known that their Class Rapid Release Gelcaps are not any faster or more effective than the Signature Care non-rapid release caplets, and thus are not "Rapid Release" products within the natural meaning reasonable consumers would apply that term.  Nonetheless, Defendants, through their misrepresentations and misleading statements related to the Rapid Release Claims, as detailed above, continued to sell the Products to New York residents in order to increase their own profits, all the while bilking consumers out of millions of dollars.

81.     Plaintiff and members of the New York Subclass suffered injuries as a direct result of Defendants' violations of GBL § 349 because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products as a direct result of the Rapid Release Claims; and (c) the Products do not have the characteristics as promised by Defendants.

82.     Had Plaintiff and the members of the New York Subclass known of Defendants' deceptive acts and practices, including the misrepresentations and misleading statements (*i.e.*, the Rapid Release Claims), they would not have purchased the Products at all or would not have purchased them on the same terms.

83.     As a result of their unfair, unconscionable, and/or deceptive acts and practices, Defendants were able to charge more money for products bearing Rapid Release Claims on their labeling and/or packaging than they would be able to charge for functionally identical products that do not purport to be "Rapid Release."

84.     As a direct and proximate result of Defendants' conduct in violation of GBL § 349, Plaintiff and the members of the New York Subclass have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member.

85.     Because Defendants' violation was knowing and willful, Plaintiff and the members of the New York Subclass are entitled to statutory and treble damages under GBL § 349(h).

86.     Plaintiff also seeks injunctive relief, including a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products and the implementation of a corrective advertising campaign by Defendants.

87.     Additionally, pursuant to GBL § 349, Plaintiff Bischoff and New York Subclass members seek attorneys' fees and costs.

### COUNT II
### Violation Of New York's General Business Law ("GBL") § 350
### (On Behalf Of The New York Subclass)

88.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

89.     Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

90.     New York's General Business Law § 350 ("GBL § 350") prohibits false advertising in the conduct of any business, trade, or commerce.

91.    Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

92.    Defendants' labeling of the Products promised that they were "Rapid Release" Gelcaps.  A reasonable consumer would understand such claims to mean that the Products work faster for consumers than non-rapid release products with the same active ingredients and of the same dosage.  However, despite what Defendants' marketing and labeling would have consumers believe, in reality, the Class Rapid Release Gelcaps do <u>not</u> provide faster pain relief than their non-rapid release counterparts.  In fact, independent testing commissioned by Plaintiff's counsel reveals that the Class Rapid Release Gelcaps are *slower* acting compared to the Signature Care-brand caplets of the same dosage.

93.    Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising, in violation of GBL § 350.

94.    Defendants' false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

95.    Defendants' false, misleading, and deceptive statements and representations of facts have resulted in consumer injury or harm to the public interest.

96.    As a direct result of Defendants' false, misleading, and deceptive statements and representations of fact, Plaintiff Bischoff and members of the New York Subclass have suffered, and continue to suffer, economic injury.

97.    Plaintiff and New York Subclass members have suffered damages as a direct result of Defendants' violations of GBL § 350 because: (a) they would not have purchased the

Products on the same terms if they had known that the Rapid Release Claims were not true; (b) they paid a price premium for the Products; and (c) the Products do not have the characteristics, use, benefits, or quantities as promised by Defendants.

98.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or five hundred dollars (whichever is greater), three times actual damages, and reasonable attorneys' fees.

**COUNT III**
**Breach Of Express Warranty**
**(On Behalf of the Nationwide Class)**

99.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

100.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

101.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, expressly warranted in the Rapid Release Claims that the Class Rapid Release Gelcaps provide faster-acting pain relief than their non-rapid release counterparts.

102.    However, the Class Rapid Release Gelcaps are *not*, in fact, faster acting than their less expensive non-rapid release counterparts.  Rather, independent testing commissioned by Plaintiff's counsel reveals that the Products are actually *slower* acting than their less expensive non-rapid release counterparts than the cheaper Signature Care caplets of the same dosage.

103.    As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff and the Class have been injured and harmed because:  (a) they would not have purchased the Products on the same terms if they knew that the Rapid Release Claims were not true; (b) they paid a price premium for the Products due to the Rapid Release Claims; and (c) the

31

Products do not have the characteristics, uses, benefits, or quantities as promised in that the purportedly "rapid release" Products are in reality slower than their non-rapid release counterparts.

104.    On or about May 31, 2022, prior to filing this action, a pre-suit notice letter was served on Defendants which complies in all respects with U.C.C. § 2-607.  Plaintiff, individually and on behalf of the putative Class, sent Defendants a letter via certified mail, return receipt requested, advising Defendants that they breached numerous warranties and violated state consumer protection laws, and demanding that Defendants cease and desist from such violations and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's letter is attached hereto as **Exhibit C**.

### COUNT IV
**Breach Of The Implied Warranty Of Merchantability**
**(On Behalf of the Nationwide Class)**

105.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

106.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

107.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, affixed Rapid Release Claims to each Product and impliedly warranted that the Class Rapid Release Gelcaps provide faster acting pain relief than their non-rapid release counterparts.

108.    Defendants breached the warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were

unfit for their intended and ordinary purpose because the Products do not, and in fact, could never provide faster acting pain relief than their non-rapid release counterparts as advertised. Rather, independent testing commissioned by Plaintiff's counsel reveals that the Products are, in reality, *slower* acting than their less expensive non-rapid release counterparts than the cheaper Signature Care caplets of the same dosage.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

109.    Plaintiff and Class members purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties.

110.    The Class Rapid Release Gelcaps were not altered by Plaintiff and Class members.

111.    The Class Rapid Release Gelcaps were defective when they left the exclusive control of Defendants.

112.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

113.    The Products were defectively designed and manufactured and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

114.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Rapid Release Claims were not true; (b) they paid a price premium for the Products due to the Rapid Release Claims; and (c) the Products do not have the characteristics, uses, benefits, or quantities as promised in that the purportedly "rapid release" Products are in reality slower than their non-rapid release counterparts.

## COUNT V
### Unjust Enrichment / Restitution
### (On Behalf of the Nationwide Class)

115.   Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

116.   Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

117.   Plaintiff and the Class conferred benefits on Defendants by purchasing the Class Rapid Release Gelcaps.

118.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Class Rapid Release Gelcaps.  Retention of those monies under these circumstances is unjust and inequitable because Defendants' inclusion of material misrepresentations of fact on the Products' labeling and/or packaging (*i.e.*, the Rapid Release Claims) induced Plaintiff and the Class to purchase the Class Rapid Release Gelcaps. These misrepresentations caused injuries to Plaintiff and the Class because they would not have purchased the Class Rapid Release Gelcaps at all, or would not have purchased them on the same terms, if the true facts were known.

119.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

## COUNT VI
### Negligent Misrepresentation
### (On Behalf of the Nationwide Class)

120.   Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

121.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

122.    As discussed above, Defendants made misrepresentations in their advertisements and related statements made in connection with the Class Rapid Release Gelcaps, specifically that the Products are "Rapid Release" gelcaps, which a reasonable consumer would understand such claims to mean that the Products work faster and thus provide quicker pain relief than Defendants' non-rapid release products with the same active ingredients and of the same dosage. However, as noted above, despite what Defendants' marketing and labeling of the Products would have consumers believe, the Class Rapid Release Gelcaps do not, in fact, provide faster pain relief than their non-rapid release counterparts.  Additionally, Defendants omitted, failed to disclose, and/or intentionally concealed from such advertisements and related statements material facts concerning the qualities, characteristics, and benefits associated with the Class Rapid Release Gelcaps, namely that the Products are actually *slower* acting as compared to their non-rapid relief counterparts.

123.    At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

124.    At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about the Class Rapid Release Gelcaps and their associated characteristics, qualities, and benefits.

125.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce

35

and actually induced Plaintiff and Class members to select and purchase the Class Rapid Release Gelcaps over their less expensive, non-rapid release counterparts.

126.    Plaintiff and Class members would not have purchased the Class Rapid Release Gelcaps, or would not have purchased them on the same terms, if the true facts had been known.

127.    The negligent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VII**
**Fraud**
**(On Behalf of the Nationwide Class)**

128.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

129.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

130.    As discussed above, Defendants provided Plaintiff and Class members with false and misleading material information and failed to disclose material facts about the Class Rapid Release Gelcaps and their associated characteristics, qualities, and benefits.  These misrepresentations and omissions were made by Defendants with knowledge of their falsehood.

131.    The misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Class Rapid Release Gelcaps.

132.    The fraudulent actions of Defendants caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendants, as follows:

(a)    For an order certifying the proposed Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b)    For an order declaring the Defendants' conduct violates the statutes and laws referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable of right.

Dated: June 13, 2022

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:      */s/ Neal J. Deckant*
            Neal J. Deckant

Neal J. Deckant
Julia K. Venditti *
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

*\* Pro hac vice application forthcoming*

*Attorneys for Plaintiff and the Putative Class*